William I. Coddington and Gladys T. Coddington v. Commissioner. Dabney M. Coddington and Martha J. Coddington v. Commissioner.
Coddington v. Commissioner
Docket Nos. 67433, 67434.
United States Tax Court
T.C. Memo 1960-95; 1960 Tax Ct. Memo LEXIS 195; 19 T.C.M. (CCH) 498; T.C.M. (RIA) 60095; May 12, 1960
*195 Fair market value of certain commercial realty, and of one-half undivided interests therein, determined. F. A. McCleneghan, Esq., and F. T. Miller, Jr., Esq., 700 Law Building, Charlotte, N.C., for the petitioners. Raymond Whiteaker, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in income tax for the year 1954, in the following cases which were consolidated for trial: Dkt. No.
Deficiency
67433
William I. and Gladys T. Cod-
dington
$ 6,180.78
67434
Dabney M. and Martha J. Cod-
dington
58,677.11 The petitioners in Docket No. 67433 claim an overpayment of the tax. The issues for decision are: (1) The fair market value, as of December 1, 1954, of certain improved and unimproved real properties which were on said date distributed to the two principal petitioners on dissolution and complete liquidation of a corporation of which they were the sole stockholders; [1] and (2) the fair market value on said date of the respective one-half undivided interests in said properties, which were so distributed to said petitioners. All other issues raised by the pleadings *196 were settled by stipulation of the parties. Findings of Fact Certain facts have been stipulated. The stipulation of facts, together with the exhibits thereto attached, is incorporated herein by reference. Petitioners William I. and Gladys T. Coddington are husband and wife; and petitioners Dabney M. and Martha J. Coddington also are husband and wife. They all reside in Charlotte, North Carolina. Each of said couples filed a joint income tax return for the year involved, with the district director of internal revenue for the district of North Carolina. The wives are parties herein solely by reason of having joined their husbands in filing the joint returns. William and Dabney (herein called the "petitioners") are brothers. C. C. Coddington, *197 Inc. was incorporated under the laws of North Carolina in about 1919; the father of petitioners was apparently the sole stockholder. The principal business of the corporation was that of acting as the distributor of Buick automobiles for the States of North Carolina and South Carolina. In about 1924, said corporation erected the so-called Coddington Building at the corner of West Trade and North Graham Streets, in the downtown section of Charlotte. It was a 5-story brick and reinforced concrete building, which was particularly designed to serve as the corporation's headquarters for its automobile distributorship. The first floor contained a large showroom and workshops; and the four upper floors contained open space for automobile storage. The building covered an area of about 100 feet by 200 feet; and it contained about 100,000 square feet of usable space. The land underlying this building, together with vacant lots which adjoined the same on two sides (all of which was owned by the corporation) had a total frontage on West Trade Street of about 192 feet; and a depth along North Graham Street of about 382 feet. In 1928, petitioners' father died; and thereupon each of the petitioners *198 inherited 50 per cent of all the outstanding shares of stock of said corporation. Thereafter they were the corporation's officers and directors. Following the father's death, the corporation ceased to be an automobile distributor; and from then on, its principal business was that of owning and operating the Coddington Building and certain other miscellaneous parcels of real estate. From about 1928 to 1939, the entire Coddington Building was leased to the Buick Motor Company. In about 1939, following the termination of said lease, most of the second and third floors were subdivided with partitions, so as to create halls and offices for rental use. During the year 1954 which is here involved, the entire first floor of the Coddington Building was rented to an automobile dealer, which used the same for its showroom, its offices, and its parts and service departments; most of the second, third and fifth floors were leased to various other tenants; and the fourth floor which was suited to warehouse purposes, was vacant. The adjoining lots were leased with the first floor. The upper floors of the building were not so equipped as to provide the most desirable type of office space, for *199 both the elevators and the washrooms were inadequate. For said year 1954, the total rental income from the building and adjacent lots was approximately $76,400; the expenses of operation approximated $32,600; and the resulting net income from the properties, before adjustments for depreciation and obsolescence of the building, was about $43,800. For the year ended June 30, 1954 the total rental income was $80,805.21 and the expenses of operation (before adjustments for depreciation) were $31,508.20. In November 1954, C. C. Coddington, Inc. was dissolved and completely liquidated; and on or about December 1, 1954, all its net assets were distributed to petitioners William and Dabney, in equal one-half undivided shares, in redemption of all their shares of stock. Thereafter, these two petitioners continued to own and operate the building jointly. Using the building as collateral security, they together borrowed $250,000 thereon from an insurance company. And, again acting together, they listed the building for sale with various real estate dealers; but did not receive any acceptable offer. Complete harmony existed at all times between the petitioners, in their handling of the properties *200 and in all other respects. Each petitioner, in his Federal income tax return for the year 1954, reported that the aggregate value of all assets which he received on liquidation of C. C. Coddington, Inc., including his one-half undivided interest in the Coddington Building and the land thereunder and adjacent thereto, was $425,303.32; that his basis for the shares of stock which he surrendered on said liquidation, was $224,153.93; and that the difference between these amounts, less certain legal expenses, represented his gain on the liquidation. The respondent, in his notice of deficiency, made no adjustment with respect to either petitioner, as to the reported basis for the shares of stock surrendered, or as to the reported amount of legal expenses incurred; but he determined that the aggregate value of all assets which each petitioner received on the liquidation should be increased to $454,035.92. Some unspecified portion of this increase in aggregate value was due to respondent's determination that the value of the entire Coddington Building, together with the value of all the land thereunder and adjacent thereto, was greater than the values thereof which the petitioners had recognized *201 in computing the values of their undivided interests therein, on their returns. A substantial part of each of the deficiencies here involved is attributable to such adjustment in valuation. The fair market value of the entire Coddington Building and all the land thereunder and adjacent thereto, on December 1, 1954, was $661,500. The fair market value on December 1, 1954, of the one-half undivided interest in said properties, which each petitioner received on liquidation of C. C. Coddington, Inc., was 50 per cent of said amount, or $330,750. Opinion 1. The first issue for consideration is the fair market value on December 1, 1954, of the Coddington Building and the land thereunder and adjacent thereto, taken as a whole. This is a question of fact which must be determined from consideration of all the relevant facts and circumstances disclosed by the record herein. Since the value of the building depends in large part on its own characteristics, and since there were no sales of similar buildings in the Charlotte area which may be used for comparative purposes, it is proper to consider the opinions of expert appraisers who may have examined the building and land involved, and *202 may have given consideration to the various factors affecting the value of such properties. The weight to be accorded to any such opinion testimony depends largely upon the demonstrated qualifications of the appraiser; the soundness of the appraisal methods, if any, which he employed; and the skill which he evidenced in selecting and weighing the factors entering into the valuation of the particular property on the material valuation date. The evidence herein establishes that in August 1954, which was shortly prior to the dissolution and complete liquidation of C. C. Coddington, Inc., the building and land here involved were appraised jointly by three expert appraisers representing the Charlotte Real Estate Board, as having a total fair market value at that time of $741,850. This appraisal was made at the request of the corporation, "to find out how much the property was worth, either for sale or for borrowing money, in order to pay off debts." The appraisers were: J. Caldwell McDonald, C. W. Todd, and J. H. Carson. McDonald was selected by the corporation. The method by which these appraisers arrived at the above-mentioned valuation is not disclosed in the record; and, at the trial *203 herein, each of said appraisers, all of whom appeared as witnesses, and also each of the parties herein, abandoned that appraisal. In February 1955, two of these same appraisers, McDonald and Todd, made another appraisal of the properties at the request of the present petitioners. This "was done for auditing purposes"; and said appraisers concluded at that time, that the fair market value of said properties on the material date of December 1, 1954, was the reduced amount of $645,409.50. At the trial McDonald, who appeared as a witness for petitioners, explained such revised figure by stating, in substance, that the prior appraisal of August 1954 embodied two "flagrant mistakes" for which he assumed the blame: (1) That the building had been regarded as an "office building," rather than "a one-purpose garage"; and (2) that in capitalizing rentals, consideration had not been given to the turnover of tenants. He testified that, in the second appraisal of February 1955, these alleged mistakes were "corrected," and also that an additional adjustment was made for obsolescence on the buildings. But he thereupon proceeded to disclaim the correctness of this new appraisal also, by stating: *204 "[We] didn't go near far enough in our effort to correct it." McDonald presented no written report and no work sheets in respect of the new appraisal; and accordingly, it is not possible to determine what method of appraisal, if any, he employed; what capitalization rate, if any, he applied to the rentals; how he computed the allowance for obsolescence to which he referred; or, indeed, whether the odd dollar-and-cents amount of the new appraisal represented anything more than an arbitrary mathematical adjustment of the prior appraisal. The same lack of supporting data exists with respect to the opinion testimony of C. W. Todd, who likewise testified as a witness for petitioners. He, like McDonald, expressed an opinion that the fair market value of the properties in question, as of the material valuation date, was that reflected in the revised appraisal of February 1955; but he did not disclose how such revised valuation was determined. The respondent, on the other hand, requested on brief that we determine the fair market value of the properties involved, on the material date, to be $695,394.87. He characterized this figure as "the average of the various appraised evaluations *205 of the subject property"; and, at another point in his brief, he referred to the figure as the fair market value "determined by respondent." However, we find no support for any such figure, in the deficiency notice, in the pleadings, or in the evidence. Indeed, the only witness which respondent presented at the trial (who was the above-mentioned J. H. Carson) testified that in his opinion the fair market value of the properties in question, on the material valuation date, was $661,500. Carson, during the course of his testimony, identified a written appraisal report for the properties, which was thereupon received in evidence at the request of the respondent. Carson testified that this report had been made by him for the Internal Revenue Service; and that it was substantially the same as a prior report which he had made for an insurance company, and in which he had arrived at the same fair market value. Carson's report contained, among other things, a picture of the Coddington Building; a survey plat, showing the dimensions of the land involved, and of the building thereon; a detailed description of each floor of the building, and of the facilities thereon; and a schedule which showed *206 the amounts of the total income, expenses of operation, and net income for the year 1954. This appraisal report also contained Carson's computations of value by different methods, including: (1) Reproduction cost of the building, less depreciation for age, obsolescence, and other factors; (2) valuation of the underlying land and adjacent lots, computed separately for each lot on an estimated front foot basis; and (3) capitalization of the rental income, at a 6.5 per cent rate. The valuation which Carson finally determined, from consideration of all these methods, was as follows: Land
$362,820
Building
298,680
Total
$661,500
It is our opinion based on a consideration and weighing of all the evidence, and we have heretofore found as a fact and here hold, that the fair market value on December 1, 1954, of the properties here involved, considered as a whole, was $661,500. 2. The second issue is the fair market value on December 1, 1954, of the respective one-half undivided interests in the Coddington Building and the land thereunder and adjacent thereto, which were distributed to petitioners on liquidation of C. C. Coddington, Inc.
Each of the petitioners, in *207 his Federal income tax return for the year 1954, reported a value for his undivided interest of $322,704.75. This amount is exactly 50 per cent of the $645,409.50 valuation made by McDonald and Todd in their second appraisal; and it reflects no adjustment or discount for the fact that the property was owned by the two petitioners as tenants in common. At the trial, the valuation witnesses for both parties testified that the only appraisals of the property which they made, or were requested to make, did not provide for any adjustment or discount by reason of the joint ownership. They all agreed that, in some circumstances, the value of an undivided interest in property might be less than the owner's proportionate interest in the property as a whole; but they further agreed that there was no "rule of thumb" for determining the amount of discount, if any, to be applied in a particular case. Carson testified that he would not attempt to make an offhand appraisal of the undivided interests in the properties here involved; and that he did not believe that any appraiser could make such an appraisal without some study. Petitioners, nevertheless, thereupon recalled McDonald; and he, on the *208 witness stand, mathematically computed a figure of $290,434.75. He did this by first taking 50 per cent of the amount of his revised appraisal of February 1955, and then deducting 10 per cent thereof. Thus he made such computation by using an appraisal which he had theretofore indicated to be inaccurate, and he gave no reason for selecting a discount of 10 per cent, rather than one of the other possible rates of discount which he had theretofore mentioned. Indeed, he failed to establish any reason for applying any discount under the particular circumstances of the present case. The evidence herein shows that, from about 1928 until December 1, 1954, the properties in question were owned and operated by C. C. Coddington, Inc., of which the present petitioners held all the outstanding shares of stock in equal amounts, and were both the officers and the directors. The evidence further shows that, on the last mentioned date, said petitioners eliminated the corporate structure; caused the properties to be distributed to them on liquidation; and, from then on, continued to own and operate the properties jointly, in complete harmony with one another. They jointly borrowed money on the properties; *209 and their only attempts to dispose of the properties were through offering the same for sale as an undivided unit. There is no evidence that, in the circumstances like the present, one-half undivided interests in real property in the Charlotte area were marketed at less than 50 per cent of the fair market value on the property as a whole. We hold, on the basis of all the evidence and in the light of the circumstances here present, that the fair market value on December 1, 1954, of the one-half undivided interest of each petitioner in the Coddington Building and in the land thereunder and adjacent thereto, was 50 per cent of the value which we have hereinabove determined for said properties as a whole, or $330,750. Decisions will be entered under Rule 50. Footnotes
1. The complete liquidation of the corporation was effected on November 30 and December 1, 1954; and the single deed by which the corporation's real properties were conveyed to the present petitioners was dated December 1, 1954. The parties agreed at the trial herein, that the values of said real properties on November 30 and December 1, 1954, were the same; and that the latter date may be used herein as the material date for valuation.↩